D86zharm          Motion

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SETH D. HARRIS, (THOMAS E.
PEREZ) ACTING SECRETARY OF THE
UNITED STATES DEPARTMENT OF
LABOR,

          Plaintiff,

     v.                    13 Misc 213 (JPO)

BRUCE JACOBSON, et al.,

          Defendants.

------------------------------x

                         August 6, 2013
                         3:45 p.m.

Before:

               HON. J. PAUL OETKEN,

                         District Judge

               APPEARANCES

U.S. DEPARTMENT OF LABOR
     Attorneys for Plaintiff
BY:  MICHAEL R. HARTMAN
     ERIC C. LUND

JACKSON LEWIS
     Attorneys for Respondents
BY:  DAVID R. JOHANSON
     DOUGLAS A. RUBEL

OLSHAN FROME WOLOSKY  LLP
     Attorneys for Respondents
BY:  THOMAS J. FLEMING

D86zharm                     Motion

1        THE DEPUTY CLERK:  All rise.  You may be seated.
2        (Case called)
3        MR. HARTMAN:  Michael Hartman on behalf of the
4   Secretary of Labor, your Honor.
5        MR. LUND:  Eric Lund on behalf of the Secretary of
6   Labor, your Honor.
7        THE COURT:  Good afternoon.
8        MR. LUND:  Good afternoon.
9        MR. JOHANSON:  David Johanson, your Honor, on behalf
10  of the respondents.
11       MR. RUBEL:  Douglas Rubel, your Honor.  Good
12  afternoon.
13       THE COURT:  And?
14       MR. HARTMAN:  Thomas Fleming also for respondents.
15       THE COURT:  Good afternoon.
16       Okay, this is a Part One matter, and I've had a chance
17  to review the parties' submissions, but I'll hear from you as
18  well.
19       The Secretary of Labor moves to enforce administrative
20  subpoenas and really, as I see it, the issue is just privilege
21  logs.  There's no issue of undue burden or anything really,
22  although there's obviously burden in doing an eighth privilege
23  log or wherever they are.  But as I see it the -- well, maybe
24  I'll have you go through and tell me what the buckets of issues
25  are.

D86zharm                Motion

1        But as I see it, the main issues are whether the
2    communications with financial advisors and other independent
3    contractors do or do not waive otherwise privileged
4    communications if in fact they involve requests for legal
5    advice or the rendering of legal advice by virtue of the
6    (phonetic) Horry Doctrine of the financial advisor exception
7    that Judge Friendly made up in the 60's, or I shouldn't say
8    made up, but that he articulated in the 60's, which is a very
9    narrow doctrine, or the functional equivalent of an employee
10   doctrine, which I think is fairly narrow too in the Southern
11   District, although there are -- on that doctrine I'm obviously
12   revealing, you know, sort of where I'm thinking about this.
13   But I'm going to give you all a chance to convince me
14   otherwise.
15       On the functional equivalent doctrine, there are
16   cases, including -- I've actually had a chance to look at the
17   Eastern District of Pennsylvania case and some other cases that
18   really do take different approaches on that issue.  I will say
19   that Magistrate Judge Davidson and Francis have written a
20   couple of opinions in the Southern District adopting a pretty
21   narrow approach to that.  So there are those issues.
22       What are the other categories of issues that I need to
23   know about Mr, is it Hartman?
24       MR. HARTMAN:  Yes.  Thank you, your Honor.
25       May it please the Court, if I may provide a very brief

D86zharm                Motion

1  context here for the petitioner.  The Secretary's investigating
2  a hundred million dollar transaction as a result of which Mr.
3  Jacobson and Mr. Lewkowitz have received $20 million and are
4  due to receive each tens cents of millions of dollars more.
5      THE COURT:  But they already, in 2008, they reduced
6  the amount that they were receiving, right?
7      MR. HARTMAN:  That appears to be the case.  But
8  they're still receiving roughly $80 million.  So it's a
9  substantial transaction, and it appears to have violated title
10  One of ERISA.  Secretary is seeking to enforce these subpoenas
11  that have been outstanding since October.  And as your Honor
12  pointed out, the primary issue is the privilege and the
13  privilege logs.  And they're really kind of a mess here.  There
14  are nine logs which have been amended, which are inconsistent,
15  which are lacking critical information, and so it's been
16  difficult for the Secretary to articulate in his papers the
17  range of issues.
18      I think the financial advisor exception that your
19  Honor noted is one of those and that clearly, as your Honor
20  pointed out, a narrow doctrine and is not supported here, where
21  respondents have failed to show that there was originally
22  privileged communication and that the financial advisor was
23  necessary for the communication of a provision of legal advice.
24      But there are other issues as well which are
25  identified in the Secretary's petition and in the other briefs.

D86zharm                    Motion

1  There is an assertion of work product over business
2  negotiations where potential litigation is purely hypothetical
3  at best.
4       THE COURT:  Let me ask you -- yes, there wasn't really
5  much argument on work product.  I didn't think any showing of
6  work product at all by respondents.  But are there any work
7  product designations that aren't also attorney-client privilege
8  designations?
9       MR. HARTMAN:  There are, your Honor.  We've identified
10 them in our brief.
11      The problem, and part of the difficulty for the
12 Secretary today is that the logs and their numbering continues
13 to change.  So it's a bit of a challenge for us to point your
14 Honor to anything specific.
15      So the first thing that we would ask your Honor to
16 order is that respondents produce a single unified privilege
17 log with the unique identifier that doesn't change, so if a
18 document, there is a document one, that document is forever
19 document one.  It's really a basic corollary of Rule 26 and
20 Rule 33, so.
21      But there are examples that apply to work product, and
22 there are also examples where the attorney-client claims are
23 fairly specious, and so the only remaining claim would be work
24 product.  So once you get rid of this financial advisor
25 exception, all you have is work product.

D86zharm                Motion

1          But beyond, looking at attorney client again for a
2    moment.  Beyond the financial advisor exception, and in fact
3    the employee doctrine which your Honor has identified,
4    respondents are trying to protect a number of documents that
5    have nothing to do with the provision of legal advice from the
6    descriptions on the privilege log.  And we actually have a
7    nifty little natural experiment there.  Respondents' counsel
8    produced several of these documents at a deposition and said we
9    could have asserted privilege over these, but we're choosing to
10   produce them to you.  They're absolutely not privileged.
11   They're basic business documents.  If there are lawyers
12   involved, that does not change the fact that they're business
13   advice and not subject to the attorney-client privilege.
14         There's also the issue, which is a fairly narrow
15   issue, of withholding of documents that are deemed
16   confidential, but over which no proper privilege has been
17   asserted.  And the issue --
18         THE COURT:  You mean the trade secrets.
19         MR. HARTMAN:  Yes, trade secrets.
20         THE COURT:  There are only like three of those, right?
21         MR. HARTMAN:  There are only like three of them.
22         THE COURT:  Okay.
23         MR. HARTMAN:  There are documents that are shared with
24   negotiating adversaries.  Actually Great Bank, who is the party
25   who is opposite People Care here, is listed on these privilege

D86zharm                 Motion

1   logs, and their counsel is identified in the key of attorneys.
2   So it's really just a very sloppy job of asserting privilege.
3   So we would ask your Honor first to order, as I mentioned at
4   the outset, a comprehensive and compliant privilege log.
5         I think that those are the general issues.  There's no
6   issue of, that the Secretary is aware of, of failure to produce
7   documents.  Obviously, the Secretary's concerned that some
8   documents were produced at depositions, but had not previously
9   been identified on logs, but we can only hope that that is at
10  this point been cured.  So the attorney-client privilege and
11  the work product are all that is at issue here.
12        Briefly, your Honor, I don't think I mentioned, there
13  are a number of documents that appear to have been prepared in
14  the ordinary course of business that are attached to
15  communications with counsel, and that respondents are seeking
16  to withhold by asserting attorney-client privilege over the
17  parent e-mail, I guess you would call it.  And the law is very
18  clear in the Supreme Court and the Second Circuit, as well as
19  in this district; that simply passing something to an attorney
20  and asking for advice on that document does not render the
21  preexisting document privileged.
22        Respondents have said they produced all these
23  documents.  Their logs show that's obviously not the case.  So
24  we've had a real problem with cooperation here with
25  respondents.  It took us until June just to get Mr. Johanson to

D86zharm               Motion

1   identify which of his clients is asserting the privileges here.
2   Despite that lack of cooperation, we're not trying to infringe
3   on the legitimate claims of privilege. We're just policing its
4   abuses where it infringes with the Secretary's -- with the
5   Secretary's investigation. So we're not seeking broad waiver.
6   All we're asking is that your Honor order that where the
7   privilege has not been proven, where the facts have not been
8   given to support a claim of privilege, those documents be
9   produced to the Secretary.
10          THE COURT: So are you asking for -- the binders that
11  I have, I wasn't clear on -- well, I guess these are from your
12  adversary. Are you asking for me to order them to make a new
13  privilege log that identifies -- there were some complaints
14  about lawyers not listed for everything. Has that been fixed
15  now or is that still a live issue?
16          MR. HARTMAN: No, that's still a live issue. Yes, so
17  the first -- what we would like your Honor to order first is to
18  produce a single comprehensive privilege log making only the
19  legitimate claims, none of the spurious claims that we've
20  pointed out in our 100 examples, none of which respondents have
21  addressed, and then to make the substantive legal rulings that
22  I've discussed, and I'm happy to address further.
23          THE COURT: Is it a waiver issue -- like the ones that
24  you talk about with the financial advisor exception and the de
25  facto employee issue, are those where they've claimed privilege

D86zharm                 Motion

1 or where something is clearly going to one of those or where
2 someone was c.c.'d, and you're arguing that even if it would
3 otherwise be privileged, it was waived because it was -- they
4 were included in an e-mail.
5         MR. HARTMAN:  Your Honor, I think the answer is both.
6 It's difficult to discern the two from the privilege logs.
7 Clearly in order to have an application of the de facto
8 employee doctrine or the financial advisor exception, you need
9 to have an underlying protected communication.  And then if a
10 nonprivileged party, a non-confidential party is included in
11 that, that can be waived.  So we think in the first case that
12 some of these documents were not privileged.  They're business
13 communications that happen to copy attorneys, but it doesn't
14 make them privileged.  And in other cases, they may otherwise
15 have been confidential, but the presence of this third party
16 waives the privilege or eliminates the confidentiality that's
17 required for the privilege.  So whether your Honor wants to
18 consider it waiver or failure to complete the ring of
19 confidentiality, I think it gets to the same place.
20         THE COURT:  Okay, thank you.
21         MR. HARTMAN:  Thank you.
22         THE COURT:  Mr. Johanson.
23         MR. JOHANSON:  Good afternoon, your Honor.
24         THE COURT:  Good afternoon.
25         MR. JOHANSON:  Just to follow Mr. Hartman's lead, if

D86zharm                 Motion

1   you don't mind, to make it more organized here today.
2       THE COURT:  Sure.
3       MR. JOHANSON:  First of all in response to -- we're
4   not going to get into the substantive issues today with your
5   Honor, but we do want to address a couple of points.
6       First of all, you did correctly note that our clients
7   did reduce the original transaction amount from 104 million to
8   80 million in December of 2008 with the involvement of an
9   entire ESOP advisory team and corporate advisory steam team.
10      In addition, your Honor, at the end of December of
11  2012, the respondents, our clients, Mr. Jacobson and
12  Mr. Lewkowitz, reduced their promissory notes by another 16
13  million.
14      On top of that, your Honor, the Secretary spend the
15  last almost year addressing a, what we believe to be a red
16  herring in this case.  And I'm not going to spend a lot of time
17  on, but I just want to point it out to you.  The Secretary had
18  challenged whether or not our clients had been forthright with
19  the ESOP advisory team consisting of Great Bank Trust Company,
20  the independent appraiser and financial advisor Stout Risius
21  Ross and Steicker Fischer law firm, and we presented evidence
22  through the testimony of Mr. Jacobson in his deposition on
23  April 12th, 2013 that basically debunked that whole approach to
24  that red herring issue.  So from our perspective there is no
25  violation of ERISA here.

D86zharm                Motion

1        That said, I know that's not what you're here to deal
2   with today, your Honor.  Mr. Hartman talks about a mess, your
3   Honor.  He mentions a mess and a bunch of privileged logs.
4        What we've done, your Honor, during the last nine
5   months is every time that Mr. Hartman has asked us to try to
6   fix something, quote unquote, that he believed to be incorrect
7   or wrong with our privilege logs, we have responded for the
8   most part and fixed the issues that he raised.
9        The only issues that we believe are, the only issue
10  that we believe is left at this point in time is whether or not
11  we're going to be required to look at 3600 entries and define
12  exactly what the attachment is on each one of those entries,
13  which we think, in and of itself, may reveal privilege, your
14  Honor.  And so we're troubled by that and we're troubled by the
15  amount of time it might take.
16        THE COURT:  What have you done already?  Haven't you
17  gone document by document and identified the nature of the
18  issue; have you done it by categories?
19        MR. JOHANSON:  We've done it -- we've used two
20  different services to do so at two different law firms, and
21  we've done a, I think a very good job of identifying a
22  privilege log, which doesn't leave the Secretary in doubt about
23  what position we're taking.  And as I said, I believe the only
24  issue left is whether or not there is -- we defined each
25  attachment fully in each particular privilege log entry, and

D86zharm                Motion

1  that's 3600 entries.  We did a sample of this, your Honor.  It
2  took one of my associates about 12 hours to go through 500
3  entries, and it took one of my paralegals nine hours to go
4  through 100 entries.  So we believe that would be burdensome,
5  unduly burdensome and over broad for us to have to go through
6  that.  But of course subject to your order, we'll do whatever
7  you request or you order.
8          Your Honor, as I said, we've done what the Secretary's
9  asked for.  We've perfected the logs in the manner in which the
10  Secretary has asked us to do so, and I think we've done it
11  quite well.  We clearly take issue with the point that things
12  are in a mess at this point.
13          The second thing, your Honor, on the work product if I
14  could, I want to point out, and maybe we failed to say this in
15  our pleadings, and I'm sorry if we didn't say this in our
16  pleadings in response to the Secretary's petition.  There are
17  six different cases that relate to the work product position
18  that we've taken, your Honor.  One is People Care Inc. versus
19  Cityo New York HRA.  I got an index number for that of 109193
20  and 2009.  I've got People Care Inc. versus City of New York
21  Human Resource Administration, index number 111467.  That's in
22  2011.  I've also got three different National Labor Relation
23  Board cases and I believe there are a number of unfair labor
24  practice charges that have been brought, all of which relate to
25  the work product position that we've taken on the privilege

D86zharm                    Motion

1   logs.  And I could give the case numbers I will --
2           THE COURT:  You don't need to.
3           MR. JOHANSON:  Okay.  Anyway, I believe our position
4   maybe we failed to say that to you properly in our response to
5   the petition, your Honor, in the opposition, but we believe the
6   work product position is well taken here, where we took it.
7           THE COURT:  Okay.
8           MR. JOHANSON:  In terms of the single unified
9   privilege log.  Again, we did nothing to try to confuse the
10  Secretary.  We tried to do what the Secretary asked us to do.
11  I've got a well structured summary of what we produced, and I'm
12  more than happy to provide that to the Secretary in addition to
13  everything we've done in order to avoid us having to go back
14  and combine all of this work into one.  But of course we will
15  subject to your order, do whatever you request your Honor.
16          One of the things that we think is important here, we
17  believe that this, and a lot of the cases that your Honor has
18  looked at and we've looked at talk about an in-camera review.
19  We would be fine with, and have proposed having your Honor
20  refer this to a Magistrate Judge or certainly do it yourself if
21  that's what you like, but the last one of these cases I was
22  involved in, I sat in court for about four hours with the
23  Magistrate Judge and I worked through the issues.  The
24  Secretary had its representative there, I had -- I didn't have
25  my client, but I had access to my client and we worked through

D86zharm                    Motion

1   the issues and we resolved them.  So I think we could winnow
2   this down, narrow it down, present arguments quite well in that
3   respect.  I've got, your Honor, I've got 15 examples right here
4   that I certainly can't provide to the Secretary right now, but
5   they are 15 good examples of where the financial advisor
6   privilege applies in our opinion, where there is either the
7   need to have a financial advisor like BCC Capital who is an
8   expert in ESOP transactions, and Mr. Josephson and his CPA firm
9   involved, they also were experts in handling large hundred
10  million dollar plus ESOP transactions.  And what happens in an
11  ESOP deal, your Honor, you may or may not know, is that you
12  have to hire -- the company that sponsors the ESOP has to hire
13  an ESOP advisory team in a deal of this nature, an
14  institutional independent discretionary trustee.  That trustee
15  has hires an independent appraiser and financial advisor.  That
16  trustee also hires legal counsel.  You've got legal counsel in
17  the corporate side, you may have legal counsel representing the
18  selling shareholders.  It's a complicated deal when you're
19  talking about a hundred million dollar deal.  So in our opinion
20  looking at the case law we've cited in our opposition, we do
21  squarely meet financial advisor exception to the
22  attorney-client privilege with respect to a number of these,
23  and we'd like that to be reviewed either by yourself or
24  Magistrate Judge in detail.  And we've got some examples we
25  could share with you that would address that very point.

D86zharm                Motion

1          THE COURT:  But generally, ESOP advisor, I mean from
2    the papers I'm certainly not persuaded that it applies.  I
3    mean, the financial advisor exception is sort of a translator
4    function where to articulate a situation for the purpose of
5    obtaining legal advice you get a financial advisor involved.
6    But when you're a company and you're doing some big deal -- I
7    used to do this when I was in-house all the time -- when I had
8    a financial advisor in the room, it was not privileged, and I
9    made everyone know that.  When we had an auditor in the room,
10   there is no auditor privilege in New York, I made -- I let
11   everyone know.  And afternoon in-house lawyers know this, there
12   is -- when you let a financial advisor into the communication
13   group circle, it's not privileged, I mean -- and I just don't
14   know what, you know, what's hard about that.
15          MR. JOHANSON:  Well, your Honor, with all due respect,
16   and of course you deserve a lot of it --
17          THE COURT:  Not really.
18          MR. JOHANSON:  -- I do take issue with that position.
19   And I think we've explained that in our pleading papers quite
20   well.  And I think the case law has evolved from Koval up to
21   the Ackard case, as well as some of the other cases we've
22   cited, and I'd be glad to go through them and explain the
23   factual circumstances of those cases relative to ours and why
24   we're on point there and why our financial advisor is their --
25   these financial advisors -- there wasn't anybody like that at

D86zharm                Motion

1   the company who had that knowledge.  I don't know what -- I do
2   know what company you worked at, but I don't know if you had
3   somebody like that.
4           THE COURT:  You guys represented us.
5           MR. JOHANSON:  Well, actually that's true and I did, I
6   did do that.
7           THE COURT:  But it' one thing, and this sort of brings
8   together the functional equivalent of employee situation; if
9   you're, you know, if someone's coming in and they're an
10  independent contractor and they're, you know, you give them an
11  office, you might give them a e-mail and they're basically
12  functioning as an employee, that's one things.  But if you hire
13  a financial firm and an appraisal firm, you know, a valuation
14  firm or whatever, or your auditor is there for a specific task,
15  that's just a third party that you've hired to do a task.  And
16  the fact that you've hired them to do this big ESOP transaction
17  is not a big piece of legal advice.  It's just not.  I mean,
18  it's a big financial transaction.
19          MR. JOHANSON:  I think it's a large financial
20  transaction that has substantial legal implications as is
21  presented by my adversaries on the other side here, who go
22  around the country, investigate closely held ESOP companies and
23  file litigation throughout the country.  So your Honor, I think
24  it has financial implications, but it also has legal
25  implications that flow from the financial considerations.

D86zharm               Motion

1   You've got technical legal issues that are derived from the
2   financial information that is provided to the ESOP advisory
3   team.  So I think there a mix, your Honor.  I really would like
4   you please take a look at, if you don't mind, In Re:  Bider,
5   it's the Eighth Circuit I realize, but to me that's a case
6   that's really close to our case.  That case talks about a
7   situation which the company hired -- it was a real estate
8   development company, and it hired an independent contractor to
9   come in and virtually attend all the meetings and help them get
10  a real estate, complicated real estate project approved, your
11  Honor.
12       In that case it's very clear that the lawyer was there
13  or, excuse me, the independent contractor was there either
14  functionally as an employee or as a financial advisor whose
15  advice and input was needed in order to accomplish the real
16  estate transaction that they were trying on accomplish in the
17  first place.  And I really believe it's right on point and
18  addresses both the employee position and the functional
19  employee position, as well as the financial advisor position
20  that we provided to you.
21       I also believe that Acard distinguishes Koval quite
22  nicely here.  And, again, I would ask you to take a look at the
23  Acard case, the Second Circuit 1999, which again focuses on
24  communications that distinguishes the important position that
25  the Koval case focused on.  This is not just important advice.

D86zharm                    Motion

1  If you do this wrong, you get these gentlemen here and the
2  Secretary of the U.S. Department of Labor filing a hundred
3  million dollar lawsuit against you or 50 million dollar lawsuit
4  against you, and that's serious business.  And so, therefore,
5  it's important to have -- and there are technical issues that
6  raised by the IRS as well.  So it's important to have the
7  financial advisor like an independent financial advisor BCC
8  Capital and an expert accountant to tell the lawyer things that
9  are interpreting and translating technical legal issues that
10  flow from the financial information that's being provided to
11  make the deal happen, in our opinion.
12          THE COURT:  But their function isn't to help the
13  lawyers.  I mean, their function is to put deal together,
14  right?  And obviously there are important legal implications
15  and you have to do it right, you have to follow ERISA and all
16  stuff.  But the primary purpose of their involvement is to do
17  the transaction, right?
18          MR. JOHANSON:  Their primary purpose in my opinion,
19  and I've been on -- you know, I've been involved in hundreds of
20  these ESOP transactions since the early 1980's, their primary
21  purpose is to assist the lawyer in explaining complicated
22  structures to the clients so that we accomplish a transaction
23  in a way that's compliant with ERISA, in my opinion.  Because
24  it is a very complicated statute, with severe consequences as
25  we see today.

D86zharm                Motion

1      Your Honor, if you don't mind, and I do appreciate
2  your view, and I hope you've -- we just wanted to share with
3  you a slightly different view of the subject matter.
4      THE COURT:  Sure.  Let me ask you while I'm thinking
5  about it, how many documents are disputed at this point?
6      MR. JOHANSON:  Well, your Honor, we produced 108,000
7  pages, and we only have on our privilege log -- I think on our
8  primary privilege log it's about 1500 entries on our primary
9  privilege log.  So out of that 108,000 this isn't -- I'm sorry
10  I can't represent to you exactly how many pages that is, but
11  it's not the large portion of the production that we did.
12  We've done 108,000 pages since November of last year.
13      THE COURT:  Do you want to clarify?
14      MR. HARTMAN:  Yes.  It's roughly 3,000 documents over
15  which respondents have asserted privilege.  And comparing pages
16  and documents is apples to oranges.  But it appears to the
17  Secretary that it may be as much as half of the documents
18  involved in the case.  So these are very very broad assertions
19  of privilege.  We're not going to deny pages have not been have
20  been produced here, but they don't seem to be the central
21  documents.  The central documents seem to be hidden behind
22  these assertions of privilege, 3,000 of them roughly.
23      THE COURT:  Okay.
24      MR. JOHANSON:  Your Honor, I do take great issue with
25  that statement.  And we'd be more than happy to identify

D86zharm                    Motion
1    exactly how many pages and share that with the Court.
2         Your Honor, a couple of other things if you don't
3    mind, and I know your schedule is tight here, we're at the end
4    of the day.
5         THE COURT:  Sure.
6         MR. JOHANSON:  Mr. Hartman indicated earlier that
7    Great Bank Trust Company was listed on the privilege log.  I
8    think that was a disingenuous example to share with the Court.
9    Yes, there were a couple of examples where we made errors and
10   we put communications on a privilege log with a 108,000 pages
11   of production that were inaccurate and incorrect.  And we
12   corrected them as soon as Mr. Hartman pointed had them out to
13   us.  And so I think that's unfair and inappropriate to raise
14   that today.
15        I think it's unfair and inappropriate to characterize
16   our efforts as sloppy.  They're not sloppy, your Honor.  We
17   spent a lot of time, a lot of attorneys hours and paralegals
18   hours to accomplish this.  And I know that my employees would
19   not be happy to hear that their work was referred to as sloppy
20   today, because it wasn't.
21        Your Honor, the major issue in this case so far in
22   this discovery matter is, is a call back.  So we had a meet and
23   confer with Mr. Hartman quite some time ago where we believe
24   that he should have returned the documents to us and,
25   immediately.  And what happened was we had to fight over that,

D86zharm                    Motion

1  fight over the fact that --
2          THE COURT:  Are these the BCC documents?
3          MR. JOHANSON:  Excuse me?  Yes, they are, your Honor.
4          THE COURT:  Tell me exactly what -- BCC is one of the
5  entities you claim is an independent contractor.
6          MR. JOHANSON:  Yes, your Honor.
7          THE COURT:  Acting as employees?
8          MR. JOHANSON:  They're a, they're a specialist in ESOP
9  transactions, who accomplish large ESOP transaction for very --
10  a number of corporations throughout the United States, and they
11  are basically an investment banker who specializes in ESOPs.
12          THE COURT:  Okay.  So tell me, did people come in and
13  have offices at People Care, like how did it work?
14          MR. JOHANSON:  I'm confident that the record will
15  reflect, if we were ever able to produce that, that BCC spent
16  time at their offices, they have spent time with their people
17  at People Care; that Harvey Josephson and his CPA firm, who
18  also responded here, who simply is just following the dictate
19  of the holder of the privilege People Care today.
20          THE COURT:  So Josephson was the auditor.
21          MR. JOHANSON:  Yes, he was the CPA.
22          THE COURT:  You're claiming that that was an employee
23  too, basically.
24          MR. JOHANSON:  Well, claiming according to my view,
25  looking at our view, looking at the case law, the Eighth

D86zharm                    Motion
1  Circuit case, and that's the one that we think fits as closely
2  as possible, that --
3          THE COURT:  The Eighth Circuit is out there.  And on
4  the other hand the Southern District Magistrate Judge cases
5  have adopted a much narrower approach and have not found what
6  the Eighth Circuit found.
7          MR. JOHANSON:  I believe, your Honor, there are some
8  Southern District cases that we've cited that also support the
9  position that the Eighth Circuit has taken, and I'd be more
10  than happy to go through those today, but they are in our
11  pleadings.
12          THE COURT:  No, I've read your pleadings, and I may go
13  back and look at the cases more closely.
14          Let me ask you, though, of the 3600 or whatever
15  documents that have not been produced on grounds of privilege,
16  what percentage of those are because of the financial advisor
17  or functional equivalent of an employee doctrine?
18          MR. JOHANSON:  My understanding, your Honor, was that
19  there were approximately 3600 entries on the various privilege
20  logs and not 3600 documents.  So I don't even know if the 3600
21  documents is an accurate statement.  It may not -- there may
22  not have been an attachment, a document on each one of those
23  e-mails.  So -- and I can't, I can't tell you exactly how many
24  of those were subject to the financial advisor, but it's not
25  huge.  I've got -- I presented those in our opposition.  And

D86zharm                 Motion

1  there are a number of places where we're taking the privilege
2  on, the work product position, for example, on the litigation
3  that's going on involving the HRA and the labor unions and
4  things like that, which we think are clearly protected under
5  work product and/or attorney-client privilege.  And that was
6  being -- that was information, your Honor, that we were sharing
7  with, my client was sharing with the financial advisor so we
8  could handle the disclosure schedules properly in the
9  transaction.  And I don't believe that that should be subject
10  to a waiver of privilege under those circumstances.  Because
11  that was information that they needed to know in order to help
12  the company and its legal counsel to decide what to put on the
13  privilege or on the disclosure schedules for the transaction.
14      THE COURT:  But is that in anticipation of litigation?
15      MR. JOHANSON:  It doesn't have to be in anticipation
16  of litigation, just potential.  You can -- if you're an
17  attorney working on an ESOP transaction or a founder of a
18  company working on an ESOP transaction, you can anticipate at
19  some point you will be investigated by these gentleman here or
20  some Other office in the United States, and that may or may not
21  lead to litigation.
22      THE COURT:  But I think you need a lot more than that
23  for work product.  You can't just sort of think, oh, there
24  might be, you know, litigation.  Because people litigate about
25  these things.

D86zharm                    Motion

1          MR. JOHANSON:  But, your Honor, the cases that I've
2    cited were real cases at the time that were going on.  So I
3    know that --
4          THE COURT:  No, no.  I know you cited some cases.  But
5    I was talking about your idea that it's something you put on a
6    disclosure schedule in anticipation of a transaction.  But
7    that's not anticipating litigation if a document really is
8    prepared by an attorney or even a non-attorney for purposes of
9    actually anticipated litigation, and I know you cited some
10   cases, that's real work product.
11         MR. JOHANSON:  I believe -- and I know you've given me
12   your lead on your position.  I do believe, however, that when
13   you're doing an ESOP transaction and you've got ERISA as the
14   bogey to comply with, and you have got to comply with a very
15   complicated statute with a high oversight by the U.S.
16   Department of Labor, you're in a position where anything you do
17   could be challenged in litigation down the road.  So I mean I
18   understand and respect your opinion, your Honor.
19         THE COURT:  Okay.  You don't have to respect it as
20   long as you understand it.
21         MR. JOHANSON:  Thank you, your Honor.  If you don't
22   mind, I just got a couple more points today, until we go
23   further of course.
24         THE COURT:  Sure.
25         MR. JOHANSON:  So I think I think the Secretary should

D86zharm                Motion

1    have returned those documents to us four or five months ago.
2    It took them awhile to respond to that.  They first sequestered
3    it.  They finally gave them back to us.  We didn't know exactly
4    what they had, so we wanted to get them back.  And we took the
5    position that they were privileged.  And we believe it was a
6    legitimate position based upon the financial advisor exception
7    and/or functionally equivalent exception to the attorney-client
8    privilege.
9           Again, I have to take big issue with Mr. Hartman
10   saying there hasn't been any cooperation and that we, myself
11   and my team have not cooperated with him.  108,000 papers of
12   production demonstrates cooperation.  Making changes to
13   privilege logs whenever Mr. Hartman asks for the changes is
14   cooperation.
15          We also have done a number of other things to support
16   this investigation.  We believe strongly in the position that
17   our clients took in this case and/or in the transactions.  We
18   don't believe there is an ERISA prohibited transaction.  We
19   don't believe there are any violations, and we clearly don't
20   believe there was any misleading or misrepresentation in the
21   course of the transaction, and we take issue with that comment.
22          Again, your Honor, I guess I'd close with, and I could
23   go into the case law more, but it's in our pleadings.  Mr.
24   Hartman mentioned lawyers not being listed, and I didn't quite
25   understand that one.  So I'm going -- I guess I'll have to wait

D86zharm                Motion

1  until I come back on that one.
2        But one thing I'd like to finish with this Court,
3  frankly, we think this doesn't -- isn't the proper setting to
4  address this.  I've got 15 examples that I think would educate
5  your Honor or a Magistrate Judge about this situation.  I'd
6  like the opportunity to go through that with your Honor or a
7  Magistrate Judge in-camera so that we would have the
8  opportunity to show the examples of why we believe the
9  financial advisor privilege applies here or why BCC and Harvey
10  Josephson and his firm were financial advisors and functionally
11  equivalent to employees here.  We think that's the proper
12  setting to do it.  We think it takes more than 40 minutes in a
13  hearing before your Honor, and we would appreciate the
14  opportunity to do that.  Mr. Hartman has not disagreed with
15  that or has not contested that.  I believe that would be the
16  appropriate way to handle this matter, your Honor.  Thank you.
17        THE COURT:  Do you want to hand you the examples you
18  gave?
19        MR. JOHANSON:  I can, your Honor.
20        THE COURT:  So I can page through them just to --
21        MR. JOHANSON:  Yes.
22        THE COURT:  Just for fun.
23        MR. JOHANSON:  I'm not going to hand up my summary,
24  I'm just going to hand up the actual examples and the first
25  pile is what I think are the best examples.  And thank you,

D86zharm                    Motion

1  your Honor.
2         THE COURT:  Thanks.  Did you want to reply to
3  anything, Mr. Hartman?
4         MR. HARTMAN:  Please, your Honor.  Very briefly.
5  These 15 examples, which of course the Secretary has not seen,
6  are being tried trotted out to justify privilege logs with more
7  than 3600 entries.  To be clear, those were 3600 lines where
8  there is an attachment.  There actually may be more than one
9  document, so there may be well more than 3600 documents being
10  withheld here.  And even if those are paradigmatic examples of
11  privilege, there is no reason for the parties to sit down and
12  hash through each of these 3600 or more examples.
13         As to the further points that Mr. Johanson raised.
14  Mr. Johanson said that it was disingenuous for me to call
15  attention to these Great Bank examples.  I brought those to
16  counsel's attention in February.  Counsel left them on their
17  logs for months and months.  If they've been removed now, it's
18  news to the Secretary.
19         And so it's not as if we're being hyper technical
20  here.  What it points to, again, is this real sloppiness that
21  even in the -- when the Secretary calls these errors oars to
22  respondents' attention, they fail to address.
23         On the work product, we concur with your Honor that
24  hypothetical future litigation doesn't justify work product.
25  The fact that there were these suits doesn't mean the

D86zharm                Motion

1   documents, whatever which work product is asserted are
2   connected in the meaningful way to those lawsuits.
3          On attorney-client, we think that respondents are
4   doing a fine job of articulating the theoretical framework, but
5   they're not laying out the facts that relate those principles
6   to this case that show a connection to request by a client to
7   an attorney for legal advice.
8          And then lastly, your Honor, we wanted to address the
9   fiduciary examination, which we did not previously have the
10  chance to address.  The only response that respondents have put
11  in their papers to our having raised the fiduciary exception is
12  that their clients were occassionally acting as fiduciaries,
13  not everything they did was wearing a fiduciary hat.  But the
14  Secretary's highlighted a number of examples that relate to
15  plan administration, and that are at the time or after the time
16  of the transaction, so.
17         THE COURT:  So explain how this works.  If it's within
18  the role of planned fiduciary --
19         MR. HARTMAN:  Yes.
20         THE COURT:  -- then even if it's privileged, you can't
21  assert the privilege?
22         MR. HARTMAN:  Vis-a-vis the participants in the plan,
23  those to whom a fiduciary duty is owed, or the Secretary of
24  Labor, who stands in the shoes of those participants.  Yes, the
25  rule of fiduciary exception.

D86zharm                    Motion

1       THE COURT:  So are you saying that as to all this
2   stuff it's --
3       MR. HARTMAN:  No, that's a subset of documents, which
4   the Secretary highlighted specific examples of in his petition.
5   Again, it's been difficult for the Secretary to pinpoint with
6   accuracy which -- what the universe of those documents is.
7       The Secretary is not asking anything super human by
8   asking respondents to give unique identifiers to these
9   documents and stick with those documents.  That's how parties
10  negotiate and meet and confer and say, you know, respondents,
11  document one doesn't appear to be privileged, the work product
12  claim doesn't appear to be substantiated.
13      THE COURT:  But he says that it's going to involve an
14  incredible amount of work to create one uniformed privilege log
15  as opposed to this whatever the seven they've done.
16      MR. HARTMAN:  If there is -- if it's easier for
17  respondents to maintain their seven privilege logs, the
18  Secretary's willing to compromise and allow them to maintain
19  that.  But they need to maintain on each of them a unique
20  identifier.  Let me explain.
21      On the first privilege log there were some number,
22  around 1500 documents.  On the second log, I believe 100 of
23  those documents were removed and the numbering completely
24  change.  So what was document 100 became document 95.
25      THE COURT:  Didn't have the same description as

D86zharm                    Motion

1   before?
2       MR. HARTMAN: No. The descriptions were changed as
3   well. So there is no way for the Secretary to identify these
4   documents over the various revisions.
5       I mean, you just need a basic unique identifier. It
6   could be a bates stamp, it could be a number that doesn't
7   changes. It can be a description that doesn't change. But
8   they're changing everything. So we just need to know what
9   we're talking about, then we can confer about this. We've
10   already had a number of conversation and we were happy to have
11   more conversations in the light of what we hope will be your
12   Honor's rulings of law today.
13       THE COURT: What do you think about their idea of, you
14   know, spending some time before a Magistrate Judge or I guess
15   me, you know, doing an in-camera review?
16       MR. HARTMAN: If there were a narrow universe of
17   documents that were disputed between the two sides where there
18   were a legitimate claim for privilege on the log, there were
19   questions as to the applicability of certain doctrines, the
20   Secretary would certainly be willing to appear before your
21   Honor or before a Magistrate Judge and to have that
22   conversation.
23       But right now as to 3600 documents it's simply not
24   practical. So if we can narrow down the universe, if
25   respondents can narrow their claims of privilege, maybe by

D86zharm                Motion

1  withdrawing these financial advisor claims, by withdrawing
2  their work product claims, by withdrawing their claims of
3  attorney-client privilege that are subject to the fiduciary
4  exception, we may be looking at a much more narrow universe and
5  then that may be --
6       THE COURT:  How do you know what the financial advisor
7  claim of privilege, for example --
8       MR. HARTMAN:  We don't.
9       THE COURT:  Oh, you don't know.
10      MR. HARTMAN:  No.
11      THE COURT:  But do you see in the body of the e-mail
12  that it was sent to someone at BCC, for example?
13      MR. HARTMAN:  Well, we don't have those e-mails so
14  we've --
15      THE COURT:  No, but in the description on the log.
16      MR. HARTMAN:  Yes, we have a description of the log
17  that was sent to someone at BCC or someone at Josephson or --
18  frankly, there are other third parties that are not discussed
19  in any of the affidavits.  There is a consulting firm called
20  Carl Marks, There are a number of investment banks that were
21  consulted, and --
22      THE COURT:  If you started a consulting firm and your
23  name were Carl Marks, wouldn't you change your name?
24      MR. HARTMAN:  I would, your Honor.  I suppose he
25  thought that, you know, the different spelling would save him.

D86zharm                Motion

1        THE COURT:  Yeah.

2        MR. HARTMAN:  But --

3        THE COURT:  Okay.

4        MR. HARTMAN:  So the answer is, we don't know for

5   certain.  It's a doctrine that was raised in correspondence by

6   respondents, and it's their burden to show privilege when

7   they're raising privilege.  We don't want to put them through

8   on the rack, we don't want to put them unnecessary burden, but

9   if they assert privilege as to those documents, they need to be

10  prepared to prove that privelege.

11       THE COURT:  Okay, thank you.

12       Mr. Johanson, did you want to address anything he just

13  said, including the fiduciary exception?

14       MR. JOHANSON:  If you don't mind just for a couple

15  minutes, if you don't mind, your Honor.

16       THE COURT:  Sure.

17       MR. JOHANSON:  First of all, there is an identifier on

18  the privilege logs that says -- that uses the word financial

19  advisor a number of times in parentheses.  So we have done

20  that.

21       It's clear not only are the names of the people who

22  Mr. Hartman is well aware of and Mr. Lund are well aware of

23  were BCC and Josephson, but there is a parenthetical that

24  addresses that.  So we disagree with that.

25       Your Honor, on the issue of whether or not an attorney

D86zharm                 Motion

1  needs to be -- I'm not going to go into the case -- but I'd
2  like to mention it to you -- the sender or the recipient, if
3  you could please look at Baptiste V. Cushman, Southern District
4  of New York 1994, we believe that that demonstrates that it
5  doesn't always have to have an attorney on the e-mail, in
6  addition to the other cases I've cited to you today and in our
7  brief.
8          THE COURT:  When you say an attorney on the e-mail?
9          MR. JOHANSON:  Meaning that the attorney doesn't have
10  to be the recipient or --
11          THE COURT:  No, that's right.  You could have a
12  business person, one could be e-mailing business person two and
13  saying Joe Lawyer just told me X, and that e-mail is priveleged
14  because the person is imparting legal advice within the
15  company.
16          MR. JOHANSON:  Exactly.  And that's the position we're
17  taking with respect to the financial advisor privilege and the
18  functional employee equivalent.
19          THE COURT:  So when company person X e-mails BCC
20  person, you know, the lawyer said this, that's not a third
21  party, that's --
22          MR. JOHANSON:  But it's revealing what the lawyer said
23  and/or revealing information that the lawyer's going to use in
24  representing the client People Care Holdings in the course of a
25  million dollar transaction.  So that's our position, your

D86zharm                Motion

1   Honor.
2           THE COURT:  Okay.
3           MR. JOHANSON:  The second one on the -- two other
4   quick things if you don' minds.
5           THE COURT:  Sure.
6           MR. JOHANSON:  I point you, if you don't mind, your
7   Honor to Pegram versus Herdrich, Supreme Court 2000 cert. from
8   the Seventh Circuit, and in that --
9           THE COURT:  Sorry, could I have the name again?
10          MR. JOHANSON:  It's, I'll spell it for you, it's
11  P-e-g-r-a-m v. H-e-r-d-r-i-c-h, Supreme Court 2000 cert. from
12  the Seventh Circuit your Honor.  And in that case -- and there
13  a number of cases like this where the courts have indicated
14  that you can have just -- if you think about it a little bit,
15  you've got a president CEO of a company who might be an ESOP
16  participant, who may be an ESOP committee member, not in this
17  case, but in other cases, maybe a plan administrator, maybe a
18  selling shareholder, so there is multiple hats.  It's well
19  established in the federal district courts and circuit courts
20  throughout this country that you can wear multiple hats.  And
21  that it's only when -- and you don't become an ERISA fiduciary
22  just buy fiat, just -- you know, you have to actually take
23  action that is actionable.  And our position here, your Honor,
24  is that the only thing that the two individuals that we
25  represent did was to select a blue chip independent

D86zharm                Motion

1  discretionary institutional trustee, and Great Bank Trust
2  Company.  That's what they did.  Based upon advice from BCC,
3  based upon input from Harvey Josephson, based upon consultation
4  with the corporate counsel, they served in a limited fiduciary
5  royal to select Great Bank Trust Company as the trustee to
6  select the ESOP advisory team to manage this transaction so
7  that we would never have to appear in a court like this, your
8  Honor.  So they did that.
9        This case makes it clear, in my opinion, that a
10  fiduciary can act in both fiduciary and non-fiduciary
11  capacities.  And I would just point to you that, you know, in
12  this case that our gentlemen, who were our clients, they
13  certainly acted in a non-fiduciary capacity when they were
14  selling stock to the People Care Holdings employees stock
15  ownership trust.  They weren't acting as fiduciaries there.
16  They were acting in a limited role as fiduciaries when they
17  selected Great Bank.  They had a limited monitoring
18  responsibility, and this is established in the case law, when
19  they had after Great Bank was selected as the trustee.  But
20  they couldn't monitor Great Bank when Great Bank was the
21  independent discretionary institutional trustee doing the deal.
22  They had, at that point they had selected somebody and they
23  were, essentially, it.  So I take the position, your Honor,
24  that they were acting in certain nonfiduciary capacities quite
25  a lot during the period of time 2008 -- 2007 and 2008, and that

D86zharm                Motion

1  those are not subject to the ERISA fiduciary exception like Mr.
2  Hartman would have you believe.  I also would point out one
3  other Supreme Court case, the Curtis Wright Corporation, that's
4  w-r-i-g-h-t v. and I'll have to just spell this for you because
5  I can't pronounce it, S-c-h-o-o-n-e-j-o-n-g-e-n, Supreme Court
6  1995 cert. from the Third Circuit, your Honor.  Again, same
7  fact pattern and legal analysis as the Eighth Circuit.  And we
8  believe that the multiple hats could be worn, and that you're
9  not always a fiduciary just because you happen to be a
10  fiduciary for one particular event.  And that's our response.
11        Again, your Honor, going back to the other points, we
12  just would ask you, either if you want to do it yourself
13  certainly or refer it to a Magistrate Judge, to have the
14  opportunity to try to address the types of examples.  That's
15  what helped in another case that we worked on is when we
16  presented a few examples, and we had the guidance of an Article
17  Three Judge like yourself or a Magistrate Judge to rule on
18  particular aspects of that, and then go back.  And we changed
19  our production accordingly to meet the dictates of the rulings
20  that we received.  That's what we're asking today.
21        We prefer not to have to combine the privilege log,
22  but if your Honor -- if you believe that would help this
23  process, your Honor, we'd be more than happy to do so at this
24  time to respect the Court and the Secretary.  And we do
25  appreciate the time you've taken to listen to us today.

D86zharm                    Motion

1        THE COURT:  Thank you.  Let me ask you when you've
2   done it before, you have both parties there, but the judge is
3   looking at it in camera, you just have one party?
4        MR. JOHANSON:  What we did was we had a session --
5   what I've done before is we've had a session in live court in
6   on the record taking our positions.  And then the, either the
7   Article Three Judge or the Magistrate would then give us some
8   instruction on how they probably are going to rule on the
9   particular issues as we go through some of these examples.
10  Some of it was done in-camera, some of it was just done making
11  arguments about the positions and examples of the positions.
12  And then the Magistrate Judge or the Article Three Judge would
13  then have us break for awhile, go out and meet and confer and
14  try to make some progress on our dispute, and that's what I
15  believe would be instructive here, your Honor.
16       THE COURT:  Okay.
17       MR. JOHANSON:  Thank you.
18       THE COURT:  Thank you.  I'm going to take a five
19  minute break before I let you go, unless you have to leave.
20       MR. JOHANSON:  No, no.  We're good.
21       THE COURT:  Okay.
22       MR. JOHANSON:  Thank you, your Honor.
23       (Recess)
24       (In open court)
25       THE DEPUTY CLERK:  All rise.  You may be seated.

D86zharm                    Motion

1          THE COURT:  Well, I'm going to address what I can
2    today, and then have you go back and apply what I say, apply
3    the principles of what I say, to the extent you can.  And then
4    with the new version, you know, presumably in a month or two,
5    you can come back and I'll do an in-camera review if I need to.
6          But I do want to basically express a couple of rules.
7    And in so doing I'm, I guess, I'm enforcing -- I'm granting the
8    Secretary's petition to enforce administrative subpoenas in
9    certain respects.
10          First of all, as a procedural matter I'm going to
11    require the respondents to either do a single privilege log or
12    to put unique identifiers in the categories of the existing
13    privilege logs.  Either of every those will suffice.
14          With respect to the financial advisor exception, from
15    what I can see in the record I think that the assertions of
16    privilege are too broad, insofar as they're based on the
17    financial advisor exception for the following reason.  I really
18    believe that that exception is limited to situations in which
19    the financial advisor is acting as a translator for the
20    specific purpose, or at least the primary purpose of obtaining
21    legal advice or is interpreting legal advice in a manner that
22    requires his or her financial expertise.
23          But beyond that -- and when I say legal advice, either
24    seeking or giving, I do not think that advising on how to
25    structure the ESOP or advising in general on financial matters

D86zharm                Motion

1 is legal advice simply by virtue of the fact that the
2 transaction has lots of legal implications and legal
3 ramifications.  And I think that's a crucial distinction,
4 because I think that dramatically narrows the scope of that
5 financial advisor exception.
6        So I'm going to require respondents to go back and
7 redo the privilege log with that those principles in mind.
8        Second, with respect to the de facto employee or
9 functional employee doctrine.  With respect to Josephson and
10 BCC, and similar entities, certainly with respect to a counter
11 party like Great Bank, which I don't think there is any dispute
12 about, but also with respect to the others I mentioned, I don't
13 think the respondents have met their burden of showing under
14 the cases in the Southern District, which I adopt as
15 persuasive, including Steinfeld V. IMS Health, and Export
16 Import Bank versus Asia Pulp and Paper.
17        Under the approach in those cases, I do not believe
18 respondents, who have the burden of establishing these entities
19 are acting as functional employees in the relevant sense and,
20 therefore, I do not believe that communications to and from
21 those entities are within the circle of the employer for
22 privilege purposes.  So I think the respondents need to go back
23 and redo their treatment of those entities.
24        With respect to work product, I'm not sure exactly
25 what the assertions have been.  But the clarification I want to

D86zharm          Motion

1   make is that anticipation of litigation requires that specific
2   litigation actually be anticipated, and not a general sense
3   that something is likely to or might result in litigation.  For
4   example, this is the type of transaction that we're likely to
5   be sued over.  That, anticipation of that is insufficient to
6   invoke the work product protection.
7          With respect to attachments to e-mails, I also want to
8   clarify that -- I think this is undisputed -- but the fact that
9   an attachment to an e-mail was then sent by e-mail to an
10  attorney, even if for the purpose of seeking legal advice, the
11  attachment doesn't become privileged unless it was an
12  attachment that was created to show the attorney.  If it was a
13  preexisting document, obviously you can't -- well, maybe it's
14  not obvious, but you cannot make it privileged by attaching it
15  to an e-mail and sending it to the attorney.
16         If it's something that's created, that's I'm putting
17  together this analysis and I'd like your advice on it, and it's
18  created for the purpose of seeking legal advice, then that
19  would be privileged, because that is the attachment itself is
20  created for the purpose of obtaining legal advice.  But if it's
21  just a preexisting document that you send to an attorney, it
22  doesn't thereby become privileged.  And I do think that
23  attachments have to be treated as separate documents that
24  require some designation of whether they're privileged or not.
25         At this point I don't think I'm in a position to say

D86zharm                Motion

1  that the fiduciary issue results in a waiver of privilege,
2  because I don't know enough about -- I'm not able to
3  distinguish this fiduciary versus non-fiduciary capacity.  So
4  I'm going to require an analysis of the privilege question,
5  rather than some blanket exception based on fiduciary status.
6       Those are the general principles I'm prepared to rule
7  on today.  What I think I would like is for the parties to go
8  back with that in mind, take another crack at it, and then come
9  back to me and we can do some sort of in-camera review where we
10  do a sampling and run through, you know, to put more meat on
11  the bones as to what specifically this entails.  Does that make
12  sense?
13       MR. JOHANSON:  Yes, your Honor.
14       MR. HARTMAN:  Yes, your Honor.
15       THE COURT:  Okay, why don't you meet and confer about
16  timing of that.
17       MR. JOHANSON:  Thank you, your Honor.
18       MR. HARTMAN:  With respect to the rulings your Honor's
19  made today, we'd also like your Honor to order the Secretary be
20  permitted to reopen the depositions of Bruce Jacobson and Jerry
21  Lewkowitz for two reasons.  First, the Secretary anticipates
22  that there are going to be additional documents produced that
23  are going to be relevant to those depositions.  And also the
24  Secretary was previously prohibited from inquiring into
25  communications between Mr. Lewkowitz and Mr. Jacobson on one

D86zharm          Motion

1   hand, and BCC and Josephson on the other hand. And given your
2   Honor's ruling on the financial advisor exception and the
3   functional equivalent doctrine, those objections should now be
4   very narrow, we think.
5       THE COURT: Why don't we wait, for efficiency
6   purposes, why don't we wait until there's been a further
7   production, unless there is -- is there some reason you need it
8   in the next month?
9       MR. HARTMAN: I think we can wait, your Honor.
10      THE COURT: It probably makes sense, but there would
11   be sort of additional reason to do it and reason to wait until
12   there's been more production of documents, if there is going to
13   be further deposition. Does that make sense?
14      MR. HARTMAN: Yes, your Honor.
15      THE COURT: Okay. Anything else for today?
16      MR. JOHANSON: May I be heard for two minutes, your
17   Honor, just to complete a full record?
18      THE COURT: Absolutely.
19      MR. JOHANSON: Thank you. I appreciate that. I just
20   wanted to, I do -- we did look at the Export Import case. And
21   our position on that is it is distinguishable from -- and we do
22   appreciate your order today, your, Honor, thank you -- we
23   believe that it's distinguishable because we believe that one
24   of the key facts in that case was Mr. Tan was just a simple
25   consultant. He was not the kind of expert that we got involved

D86zharm                 Motion

1    in these particular cases.  So we would argue that that's
2    different.
3            We would argue that PCH circumstances are
4    distinguishable because there's a very small fraction of the
5    CPA's and investment bankers in this country who have expertise
6    of the kind that was involved in this case, representing People
7    Care Holdings.
8            Secondly, your Honor, I just wanted to point out a
9    couple of facts that I neglected to raise earlier that I'd like
10   you to be aware of.  This is a small, People Care is a small
11   closely held company.  It's a family business that was owned at
12   one point by -- partially by Mr. Jacobson's father, and now
13   owned -- it was owned at the time of this transaction by two
14   individuals who sold to the ESOP.  Although they have 3600 home
15   health care workers, they don't have a tremendous staff like a
16   publicly traded company that you might have been associated
17   with in your day at Cablevision.  This is a small closely held
18   business as far as we're concerned.  And they just didn't have
19   the people on staff to do the types of things that these
20   particular financial advisors, BCC Capital and Mr. Josephson
21   did.
22           I also would point out the Ross case, if you don't
23   mind, your Honor, just for your further review.  It's in the
24   Southern District of New York, and we believe that it supports
25   the position we've taken in this case.  That's Southern

D86zharm               Motion

1   District of New York 2004, Ross versus UKI Limited.

2       And, finally, on the issue of business advice versus,

3   or business matters versus legal advice, I believe that the key

4   test there in Pritchard and the Second Circuit is the

5   predominant purpose.  And we would argue that the predominant

6   purpose here was the legal advice that was being provided to

7   the client.

8       Thanks for allowing us to be heard and completing the

9   record in this matter, your Honor.

10       THE COURT:  Sure.  Okay.  Anything else for now?

11       MR. HARTMAN:  No, your Honor.

12       MR. JOHANSON:  No, your Honor.  Thank you very much.

13       THE COURT:  Thank you very much.

14       MR. RUBEL:  Thank you.

15       (Adjourned)

16

17

18

19

20

21

22

23

24

25